*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* STANDIFER, Minors.

UNPUBLISHED
March 16, 2023

No. 362473
Wayne Circuit Court
Juvenile Division
LC No. 2021-001159-NA

---

*In re* E J STANDIFER, Minor.

No. 362474
Wayne Circuit Court
Juvenile Division
LC No. 2021-001019-NA

---

*In re* K D STANDIFER, Minor.

No. 362475
Wayne Circuit Court
Juvenile Division
LC No. 2021-001021-NA

---

Before: MURRAY, P.J., and RIORDAN and YATES, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent father appeals as of right the termination of his parental rights to his five minor children: AJRS, ANS, EERS (Docket No. 362473); EJS (Docket No. 362474); and KDS (Docket No. 362475). The trial court concluded that statutory grounds for termination existed under MCL 712A.19b(3)(g) and (j). The trial court also determined that it was in the children's best interests to terminate respondent's parental rights. Respondent now argues on appeal that the trial court erred in concluding that statutory grounds existed for termination and

---

[1] *In re Standifer Minors; In re E J Standifer Minor; In re K D Standifer Minor*, unpublished order of the Court of Appeals, entered August 9, 2022 (Docket Nos. 362473, 362474, and 362475).

improperly determined that termination was in the best interests of the minor children.  Because the trial court ruled correctly in both regards, we affirm.

## I.  FACTUAL BACKGROUND

Children's Protective Services (CPS) received a referral claiming respondent had sexually abused 15-year-old MAR, the daughter of respondent's live-in girlfriend.  Petitions were then filed seeking termination of respondent's parental rights to his five minor children: AJRS, EERS, ANS, EJS, and KDS.  The petitions alleged that respondent had a history with CPS, which included various substantiated investigations involving threats and domestic violence against respondent's partners that occurred in front of his children.  Additionally, the petition concerning AJRS, EERS, and ANS asserted that respondent had not visited or provided support for them since January 2015.

At the adjudication regarding all three petitions, MAR testified about abuse perpetrated by respondent.  According to MAR, a few months after she began living in a home with respondent, she was asleep when she felt respondent rub her buttocks.  Respondent then repeated this behavior on multiple occasions, and the abuse escalated to respondent pulling down MAR's pants while she was asleep and touching her bare genitals.  Often, one of respondent's children was in the room while this occurred.  Respondent became emboldened.  He followed MAR into the bathroom and put his penis into MAR's mouth while she was sitting on the toilet.  This was the first of multiple instances when respondent put his penis in MAR's mouth.  Respondent's sexual abuse eventually escalated to him penetrating MAR's vagina with his penis, which occurred on three occasions.  In addition, respondent tried to take pictures and video of MAR while she was taking a shower.  MAR told her mother about the abuse after respondent first touched her inappropriately, but her mother did not believe her.  MAR ran away from home because she was tired of the sexual abuse and felt she had no one to talk to about it.  MAR did not think that the sexual abuse she was experiencing from respondent was "okay," and it made her feel like a "dark hole" and caused her to cry.  MAR said she did not feel safe when she was living with respondent and that everyone in the house was afraid of respondent.  In addition to the sexual abuse, MAR said that respondent would physically abuse both his mother and MAR's mother.

MAR spoke with CPS specialist Devin Green about the abuse, and also discussed the abuse with Kids Talk.  MAR explained she did not reveal the vaginal penetration during the Kids Talk interview because she was overwhelmed, but her grandmother told her to tell the truth when she testified.  MAR's mother did not believe MAR's allegations; she thought MAR was being coached by her maternal grandmother.  MAR only told her mother once that respondent was touching her.  MAR's mother believed that MAR had made it up because MAR was in trouble for her problematic behavior.  MAR stated that she only told her mother about the abuse once because it caused a fight between them.  MAR's mother, in contrast, stated MAR had a good relationship with respondent and even called him "dad."  MAR's mother denied ever being assaulted by respondent, and denied contacting the police about respondent except on one occasion in January 2021 when respondent began stalking her after they broke up.  MAR's mother did not like how respondent spoke to her on occasion, but she denied being afraid of him or being physically abused by him.

CPS specialist Devin Green had observed visits between respondent and some of the minor children, and she testified that the visits did not go well.  During one visit between respondent and KDS over Zoom, respondent called KDS's mother inappropriate names and threatened to "pop"

KDS in the mouth if she did not stop hiding from him. Green tried to explain to respondent that his behavior was inappropriate, but respondent disagreed. AJRS, EERS, and ANS did not want to see respondent, so visits did not occur. Green testified that respondent had not been involved with AJRS, EERS, and ANS in the last six years. According to Green, respondent told her that he had been diagnosed with schizophrenia but he was not receiving any mental health treatment.

Respondent testified and denied that he threatened harm or domestic violence. Respondent stated that he had "a very slick mouth and a mean way of saying how [he] feel[s,]" which could be considered inappropriate and may have felt threatening. Respondent denied that he was violent toward anyone. Respondent also denied ever touching MAR inappropriately, asserting everything MAR said was a lie. Respondent voiced displeasure about the visits he had with the children. He alleged that the children's mothers kept him from seeing his daughters, and he felt the caseworkers supervising his visits with EJS were abusing their authority. Respondent admitted that he had sent a text message to one of the caseworkers stating that he would pay somebody to physically harm her, but he did not feel that the message was threatening. Respondent acknowledged that he made a joke about taking EJS to a strip club during a visit, at which point the caseworker ended the call. Respondent did not believe the statement was inappropriate because it was designed to make EJS feel better and was just a joke. When asked, respondent testified that he did not know the birthdays of AJRS, ANS, or EERS.

After closing arguments, the trial court ruled from the bench that the Department of Health and Human Services (DHHS) had demonstrated that termination was warranted pursuant to MCL 712A.19(b)(3)(g). On the basis of evidence that respondent sexually abused MAR, the trial court determined that the risk to the other children would be "quite great." The trial court subsequently issued a written order in which it determined that termination was also warranted pursuant to MCL 712A.19b(3)(j).[2] In that order, the trial court found that there was clear and convincing evidence that respondent had sexually abused MAR, that respondent had an extensive CPS history involving domestic violence, that respondent had several personal protection orders issued against him, that respondent had been diagnosed with schizoaffective disorder but he was not participating in mental health services, and that he was unemployed at the time the petition was filed. The trial court also found that respondent had been largely uninvolved in the lives of AJRS, ANS, and EERS.

The trial court then held a hearing to consider whether termination of respondent's parental rights was in the best interests of the children. Respondent did not attend the best-interests hearing, where the trial court heard testimony from multiple women who were former romantic partners of respondent. Those women testified about respondent's lengthy history of abuse and his failure to support his children. The trial court decided that it was in the best interests of all five children to terminate respondent's parental rights. The trial court emphasized respondent's extensive history of abuse, found that respondent had caused trauma to each of the children, and concluded that the only way to protect the children was to terminate respondent's parental rights. The trial court also

---

[2] The trial court made that finding for EJS, AJRS, ANS, and EERS, but the petition concerning KDS did not state that termination was warranted under MCL 712A.19b(3)(j). It is unclear why the trial court did not make that determination for KDS, as the trial court's factual findings for KDS were identical to the factual findings made regarding the other petitions.

observed that, other than EJS, none of the children had a meaningful relationship with respondent. Although respondent had been present in EJS's life, the trial court was concerned that respondent was a negative influence and EJS was at risk of following in respondent's footsteps. Consequently, the trial court terminated respondent's parental rights to AJRS, EERS, ANS, EJS, and KDS. The trial court placed AJRS, EERS, ANS, and KDS in their mothers' custody and approved a plan of adoption for EJS, whose biological mother is deceased. Respondent now appeals.

## II. LEGAL ANALYSIS

On appeal, respondent contends that the trial court erred when it determined that statutory grounds for termination existed under MCL 712A.19b(3)(g) and (j). Respondent also asserts that the trial court erred when it found that termination of respondent's parental rights was in the best interests of the children. We will address each of these arguments in turn.

## A. STATUTORY GROUNDS FOR TERMINATION

We review "for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014); see also MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). We afford "deference to the trial court's special opportunity to judge the credibility of the witnesses." *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). "It is not for this Court to displace the trial court's credibility determination." *Id*. at 460. We review the interpretation and application of statutes and court rules de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014).

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011). Under MCL 712A.19b(3)(g), a court may terminate a parent's parental rights to a child if the court finds that "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." Under MCL 712A.19b(3)(j), the court may terminate a parent's parental rights to a child if the court finds that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." "The harm contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm." *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021).

Here, the trial court concluded that termination was warranted under MCL 712A.19b(3)(g) and (j). On appeal, respondent's argument is focused largely on attacking MAR's credibility. The trial court found MAR's testimony credible, and this Court defers to the trial court's determination of the credibility of the witnesses. See *In re HRC*, 286 Mich App at 459. Respondent's challenge to the trial court's credibility finding is unpersuasive. Respondent asserts MAR was not credible

in part due to her lifestyle, which allegedly included sneaking out of the house, posting nude photos of herself online, and talking to boys. These facts, even if true, do not bear upon the credibility of MAR's testimony concerning the abuse she suffered at the hands of respondent. To the extent that respondent argues MAR's testimony was not credible because of alleged sexual behavior between MAR and others, we reject that argument as both offensive and unpersuasive.

Additionally, the record supports the trial court's finding that termination was warranted under MCL 712A.19b(3)(g) and (j). The trial court observed that, because respondent had sexually abused a child living in respondent's home, the risk of harm to the other children "would be quite great." The testimony supported that finding, as there was testimony that respondent had sexually abused MAR, a teenaged girl living in his home and with whom he had a relationship akin to that of a father and a daughter. There was also testimony that some of the sexual abuse occurred while other children were present, which further exposed the other children to the risk of emotional harm that would result from witnessing their father sexually abusing a child.

The evidence further revealed that respondent threatened everyone around him, including children, romantic partners, and caseworkers. Remarkably, respondent did not seem to understand that his threatening behavior was wrong. Additionally, the record established that respondent had not been involved in the lives of AJRS, EERS, and ANS for six years leading up to the trial. Thus, the testimony demonstrated that respondent created an abusive environment and that there was a reasonable likelihood that the children would be harmed if returned to that environment. See MCL 712A.19b(3)(j). Moreover, that abusive environment was inconsistent with providing proper care and custody for the children, and there was no reasonable expectation respondent would be able to provide proper care and custody within a reasonable amount of time. See MCL 712A.19b(3)(g). This was especially true for AJRS, EERS, and ANS, who had little, if any, contact with respondent in the years preceding the trial. In sum, there were sufficient grounds for termination under MCL 712A.19b(3)(g) and (j) with respect to all five children.

## B. BEST INTERESTS

We review a trial court's findings on the best interests of the children for clear error. *In re White*, 303 Mich App at 713. "Once a statutory basis for termination has been shown by clear and convincing evidence, the court must determine whether termination is in the child's best interests." *In re LaFrance*, 306 Mich App 713, 732-733; 858 NW2d 143 (2014). When determining whether termination is in the best interests of the children, the focus is upon the children, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). The "[b]est interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733. When making this determination, the trial court "may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). Additional considerations are the parent's history of domestic violence, the visitation history with the children, "the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

On appeal, respondent asserts that the trial court erred in determining that termination of respondent's parental rights was in the best interests of the children. Respondent notes that he was employed, that he had the ability to provide for his children, that the testimony regarding his failure to support his children was "minimal," that several of his children were "kept from him," that the

maternal grandfather of one of the children did not believe respondent's parental rights should be terminated, and that respondent shared a bond with his children, especially EJS. These arguments are largely contradicted by the record. The evidence at the hearing overwhelmingly supported the finding that termination of respondent's parental rights was in the best interests of all five children. Indeed, the testimony from the mother of KDS, the mother of AJRS, EERS, and ANS, the mother of MAR, and the maternal grandfather of EJS led ineluctably to that finding.

The testimony revealed that four of the five children—KDS, AJRS, EERS, and ANS—had no bond with respondent. According to their mothers, not only did the four children have no bond with respondent, but none of them desired to have a bond with respondent. KDS's mother testified that KDS hid under the bed when she heard respondent's voice. Melanie Williams, the program director at the Ennis Center for Children, testified that EJS had a bond with respondent, but it was not a healthy bond and respondent's behavior made EJS "sad." Indeed, despite that bond, Williams believed it was in the best interests of EJS for respondent's parental rights to be terminated. EJS's maternal grandfather also testified that EJS shared a bond with respondent, but it was not a healthy bond.

Several witnesses, including three different women who had each spent years in a romantic relationship with respondent, testified that respondent had a lengthy history of domestic violence against them. One former partner testified that she went to the hospital multiple times as a result of respondent's physical abuse and she required reconstructive surgery after one incident because of how brutally respondent beat her. Several incidents of abuse occurred while she was pregnant. Another former partner testified that respondent slapped her in the face. Several women testified that some of respondent's abuse stemmed from their unwillingness to engage in sexual acts with respondent. To compound the problem, the women testified that the physical abuse was witnessed by several of the children. EJS witnessed abuse on multiple occasions, which caused EJS to cry and scream at respondent to stop. There was also testimony that respondent had physically abused some of the children, including flinging one of the children like a rag doll when that child was two years old. In addition to evidence that respondent was abusive to romantic partners, there was also testimony that respondent was verbally abusive to caseworkers and threatened to kill a caseworker. As a result of that abuse, respondent was not welcome at the Ennis Center. According to Williams, EJS witnessed that behavior from respondent and it made EJS sad.

As all of this evidence establishes, the trial court's finding that termination was in the best interests of the minor children was well-supported. Respondent claims that he was employed and could provide for his children, so that factor weighed against the trial court's determination. While there is some evidence for respondent's claim that he was employed, that fact is only tangentially related to respondent's ability to parent his children and whether termination of his parental rights was in the children's best interests. The evidence at the hearing, including the first-hand accounts from the mothers of several of the children, demonstrated that respondent created a hostile living environment filled with fear of both physical and sexual abuse. The fact that respondent may have been employed at the time of the hearing does not overcome the mountain of evidence supporting the trial court's determination.

Respondent also claims that EJS's maternal grandfather testified that respondent's parental rights should not be terminated. That is incorrect. At the hearing, EJS's maternal grandfather was asked if he thought that respondent's parental rights should remain intact. He responded bluntly:

"No." He further testified that he believed it was in EJS's best interests never to see or speak with respondent. He explained that EJS would demonstrate problematic behaviors after he interacted with respondent, so EJS's maternal grandfather believed respondent was incapable of raising EJS to be a citizen who contributes to society. This testimony supported the trial court's determination that termination was in the best interests of EJS. Thus, the trial court's finding that termination of respondent's parental rights was in the best interests of the children was supported by the evidence at the hearing.[3] Because the trial court's determination was not clearly erroneous, see *In re White*, 303 Mich App at 713, we must uphold that finding on appeal

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ Christopher P. Yates

---

[3] In his brief, respondent makes a passing reference to several arguments to support his conclusion that the trial court erred when it determined that termination was in the children's best interests. To the extent that we have not addressed each of those cursory arguments advanced in respondent's brief, those arguments are unpersuasive and therefore, rejected.